UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| AQUILA LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 8-64-B-W |
| | ) | |
| CITY OF BANGOR, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION ON MOTIONS FOR SUMMARY JUDGMENT
AND MEMORANDUM OF DECISION ON MOTIONS TO EXCLUDE**

In May of 2007, an attendant at the Bangor International Airport was servicing the lavatory of a plane owned by the Plaintiff, Aquila LLC.  By accident, the attendant pumped considerably more lavatory fluid into the plane's tank than it was designed to hold.  Lavatory fluid, a known corrosive, overflowed into the plane's newly-appointed passenger compartment and found its way into various reaches of the fuselage.  At the time of the incident, the plane was being transported to a potential buyer who had made a handshake deal to purchase the plane for $12 million.  That buyer backed out when he heard of the spill, after failing to persuade Aquila to accept $11 million instead.  After a few months, Aquila sold the plane to another buyer for $11.2 million.  Cross-motions for summary judgment are now before me on referral from the Court.  Additionally, there are two motions to exclude expert testimony.  The former motions are addressed by means of report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  The latter are addressed in a memorandum of decision pursuant to 28 U.S.C. § 636(b)(1)(A).  A related motion for oral argument I leave unresolved, in the event that the Court should wish to speak to the parties in the context of any objection to my conclusions.

## I. THE DAUBERT MOTIONS

> Federal Rule of Evidence 702 imposes an important gatekeeper function on judges by requiring them to ensure that three requirements are met before admitting expert testimony: (1) the expert is qualified to testify by knowledge, skill, experience, training, or education; (2) the testimony concerns scientific, technical, or other specialized knowledge; and (3) the testimony is such that it will assist the trier of fact in understanding or determining a fact in issue.

Correa v. Cruisers, 298 F.3d 13, 24 (1st Cir. 2002). See also Fed. R. Evid. 702; Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 592 (1993) (discussing trial judge's role in screening scientific expert testimony for reliability and relevancy); Diefenbach v. Sheridan Transp., 229 F.3d 27, 30 (1st Cir. 2000) (setting forth three requirements of Rule 702). In Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137 (1999), the United States Supreme Court made clear that the trial judge's "gatekeeping" obligation applies not only to "scientific" knowledge, but also to "technical" or "other specialized knowledge." Id. at 141. The trial court must remember that "the ultimate purpose" is "to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue." Cipollone v. Yale Indus. Prod., Inc., 202 F.3d 376, 380 (1st Cir. 2000); accord Hochen v. Bobst Group, Inc., 290 F.3d 446, 452 (1st Cir. 2002) (quoting Cipollone).

The City of Bangor has filed two motions to exclude Aquila's proffered experts' testimony. The fist motion addresses testimony by Joseph L. Auster on the standard of care pertaining to the provision of lavatory services. The second motion addresses testimony by Barry P. Justice concerning the fair market value of the plane before and after the incident and the effect that notice of the incident would have on prospective purchasers.

**A.     Motion to Exclude Auster Testimony (Doc. 26)**

Joseph L. Auster offers the opinion that the attendant performing the lavatory service did not follow the standard of care governing aircraft lavatory services when he failed to observe that, after he released the spring-loaded button on the service truck, the truck continued to pump lavatory fluid into the aircraft.  According to Auster, one must visually monitor the fluid flow gauge when pumping lavatory fluid.  Auster also maintains that the attendant was negligent when he failed to recognize that the lavatory fluid was still pumping while he was flushing the waste hose.  The City's motion to exclude this testimony is based on two grounds:  (1) none of the six sources of instructions on lavatory service identified in the case requires the technician to check the flow meter after releasing the button to ensure that the flow of lavatory fluid has stopped and (2) the question of whether the technician should have observed that the pumping continued after he released the spring-loaded button is an issue within the typical juror's common knowledge and does not require expert testimony.

The City has not directly challenged Auster's experience and qualifications.  He has been involved with aircraft maintenance and management for 25 years.  He has personally performed lavatory servicing of aircraft and has trained employees concerning the same.  As to the City's first objection, that the written materials do not directly discuss the "standard of care" involving visual monitoring of the fluid flow gauge, I am satisfied that Auster can offer his opinion on this issue without direct support in any of the six documents cited by the City.  Auster testified at his deposition that in aviation all critical operations, whether undertaken by a pilot or a ground technician, involve a check and double check, and that this general requirement is widely published.  In his words:

"[E]verything we do in aviation is done with a check and balance. And that is an industry standard that is published in the FAA regulations as well as most service regulations as to having a check and balance for everything you do on an airplane." (Auster Dep. at 44, Doc. 29-3.) Auster gave this testimony in direct response to the City's challenge that he cite a publication containing the "observe the gauge" rule. Auster has a reasonable basis to support his opinion about how servicing should be conducted and a claimed industry-wide "standard of care" should not be excluded simply because it does not directly appear in any of the six cited publications. The City does not cite any case or rule to the contrary and it would be a strange rule indeed to limit an expert's opinion to simply restating what was already plainly stated in many commonly available publications.

As for the argument that Auster's expertise will not assist the trier of fact, I think that the mechanics of pumping fluid into an airplane lavatory is something that jurors would need to know in order to adequately assess the facts in this case. While the analogy of pumping gas into a car might make this testimony seem unnecessary and of little assistance, the actuality is that Auster's expertise regarding the "red flag" that the refilling of the waste hose should have provided the ground crew is far from apparent to the average person with no knowledge of aircraft lavatory system maintenance. There is nothing unfairly prejudicial about this testimony. It is simply a qualified expert's opinion as to how the process should have been monitored. Pursuant to the Court's referral and 28 U.S.C. § 636(b)(1)(A), the motion to exclude Auster's testimony (Doc. 26) is DENIED.

**B.      Motion to Exclude Justice Testimony (Doc. 31)**

The City's second motion to exclude seeks to exclude the testimony of Barry P. Justice on two issues:  (1) the fair market value of the plane before and after the overflow incident and (2) the effect that notice of the overflow incident would have on prospective purchasers.[1]  I agree with the City that Justice's opinion about the alleged diminution in the market value of the aircraft is not proper expert testimony.  Justice is not an appraiser and he has no expert opinion about the value of the aircraft before and after the spill other than what he was told about private agreements concerning the sale of the plane.  Any lay person could perform the same mathematical calculation of subtracting the amount ultimately received for the aircraft from the price reached in the pre-incident agreement. Aquila appeals to Justice's experience in aircraft marketing generally to justify an assertion that a formal appraisal is a waste of time when there are arm's length agreements both before and after the incident to set the fair market price.  (Pl.'s Opposition to Mot. to Exclude Justice Testimony at 4, Doc. 55.)  Nevertheless, I am not impressed that Aquila has done anything more than retain an experienced marketer of aircraft who might be able to make an *ipse dixit* seem like something more than what it is. Mr. Justice concedes that there is no application of specialized knowledge behind his opinion.  (Justice Dep. at 29, Doc. 32-3.)  Because there is no application of specialized knowledge or any analytical methodology at work here, Justice's testimony concerning the pre-incident and post-incident fair market value of the plane is excluded.

---

[1]      A cursory review of Justice's report indicates that he is prepared to offer expert opinion on other issues, such as the adequacy of Aquila's marketing efforts and the recognized long-term corrosive effects of lavatory fluid in the area under the internal fuel tanks where corrosion is prone to occur and would be aggravated by spilled lavatory fluid.

Justice's opinion regarding the impact that notice of the spill would have on prospective purchasers of the plane is part of his overall opinion regarding Aquila's efforts to market the plane and need not be excluded.  It is, however, hardly more than the application of common sense.  Pursuant to the Court's referral and 28 U.S.C. § 636(b)(1)(A), the motion to exclude Justice's testimony is GRANTED IN PART.

## I.   THE SUMMARY JUDGMENT MOTIONS

Aquila claims it is entitled to summary judgment on its contract claim because the undisputed facts establish that there was an implied contract for services and breach, causation and damages are all undisputed.  (Pl.'s Mot. Summary J. at 3, Doc. 27).  The City's motion for summary judgment targets components of Aquila's claim of damages, without contesting liability.  (Def.'s Mot. Summary J. at 1-2, Doc. 33.)  However, the City subsequently makes a back-door attempt to obtain summary judgment on the liability question by characterizing its opposition to Aquila's summary judgment motion as a cross-motion for summary judgment on the issue of liability.  (Doc. 62/68.)

The following facts are drawn from the parties' competing statements of material facts, filed in accordance with Local Rule 56, and from the record cited in support of those statements.  See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

Aquila is a limited liability company formed in Indiana in 1996 as an aircraft

leasing and resale company.  Aquila is owned by Sherman Rogers, a resident of

Bloomington, Indiana, and by Fine Light, Inc, an Indiana corporation owned by Mr.

Rogers.  (Def.'s Statement of Material Facts (DSMF) ¶ 3, Doc. 34.)   Aquila and other

companies owned or controlled by Mr. Rogers purchase aircraft to resell them for a

profit.  Since 2004 or 2005, Aquila and other corporations owned by Rogers and Fine

Light have used Jay Mesinger of Boulder, Colorado, as a broker to purchase and sell

aircraft on their behalf.  At his deposition Mr. Mesinger described Aquila and Sherman

Rogers's business as "speculating in aircraft."  (Id. ¶ 4.)

       In September 2006 Aquila purchased the plane that is the subject of this dispute, a

1994 Canadair Challenger 601-3R.  (Id. ¶ 6;  Rogers Decl. ¶ 2, Doc. 41-2.)  Aquila

stripped down the interior of the plane and refurbished it to an up-to-date and like-new

condition.  (DSMF ¶ 9.)  In May of 2007, Aquila flew the plane to Switzerland to display

it to potential buyers at an air show.  There, discussions were had among Sherman Rogers

and Jay Mesinger (on behalf of Aquila) and Monis Shirazipour (on behalf of Aero LLC[2]),

concerning Aero's purchase of the plane from Aquila.  A purchase price of $12 million

was acceptable to both Rogers and Shirazipour.  (Id. ¶¶ 11-12.)  There was an oral

agreement that Aquila would pick Shirazipour up in Montreal on a certain date, using the

plane, and transport Shirazipour to Connecticut where the paperwork would be

completed.  (Id. ¶ 13.)  According to Rogers, Shirazipour stated words to the effect that

he would purchase the plane for $12 million "as is," based on Aquila's own inspection

and without conducting any independent pre-purchase inspection.  (Id. ¶¶ 13-14;  Aquila

(Rogers) Dep. at 72-73, Doc. 35-2.)  Shirazipour's deposition testimony is conflicted to

---

[2]        Aero LLC is a corporation formed and owned by Morris Shirazipour that purchases, inventories
and sells aircraft under the name Aero Toy Store.  (DSMF ¶ 5.)

some extent, but it is not necessarily inconsistent with Rogers's testimony.  He does not recall specifics, but stated that customarily, with someone he trusts like Jay Mesinger, he will agree to a purchase based on a handshake and then "send whomever we need to send to do the due diligence."  (DSMF ¶ 15; Pl.'s Opposing Statement ¶ 15, Doc. 60.)  On the other hand, he stated that in this case the plane ride from Montreal to Connecticut (and then on to Florida) would have amounted to a satisfactory pre-purchase inspection and Aero would have purchased it "if it didn't fall from the sky."  The idea was that "a pre-purchase inspection was a ride from . . . Montreal to Florida, and subject to that was our deal."  (DSMF ¶ 20; Shirazipour Dep. at 19, 71-72, Doc. 35-5.)  Mesinger recalls the agreement as Rogers did.  He testified at his deposition that it was agreed that there would be no independent pre-purchase inspection.  (Pl.'s Statement of Materials Facts (PSMF) ¶ 25, Doc. 37; Mesinger Dep. at 114, Doc. 48-2.)

How Shirazipour would have regarded the plane's performance on such a ride is unknown.  En route to Montreal, the plane landed at Bangor International Airport to clear customs, purchase fuel and receive lavatory service.  (PSMF ¶¶ 36-37.)  During the course of the lavatory service, airport employees (employees of the City of Bangor) pumped an excessive volume of lavatory fluid into the plane.  Rogers and other Aquila personnel spent an hour and a half attempting to mop up the excess lavatory fluid and waiting for it to drain from the Aircraft.  Aquila flew the plane to Duncan Aviation in Battle Creek, Michigan, for repairs.  (PSMF ¶¶ 38, 40, 42, 43.)  Lavatory fluid is a corrosive that is potentially harmful to aircraft and aircraft components.  (Id. ¶ 93.)

Aero refused to purchase the plane for $12 million after learning of the lavatory fluid incident, but offered $11 million instead. Aquila declined that offer and the sale fell through. Aquila sought another buyer. (DSMF ¶¶ 33, 37, 38, 40.)

The City conducted an investigation of the incident, which yielded a report and a recommendation for disciplinary action against Mr. Guay, the attendant who handled the operation. (PSMF ¶ 44; Investigator's Report, Doc. 38 (sealed); City Manager's Decision on Disciplinary Appeal, Doc. 49-3 (sealed).) In the report the City's investigator concludes that the incident occurred due to a poorly maintained pump switch that stuck in the on position and a failure on the part of the attendant to competently assess the problem in a timely fashion due to a lack of attention and care. The investigator's findings indicate that roughly 100 gallons of lavatory fluid was pumped into the plane (the plane's lavatory system holds fewer than eight gallons).[3] Aquila cites the report and the decision on the disciplinary appeal to establish that the City's negligence or breach is beyond dispute. (PSMF ¶¶ 45-79.) The City objects to Aquila's use of the investigator's report, arguing (1) that it is unfairly prejudicial per Rule 403, because the Investigator's findings do not equate with a legal finding of negligence or breach, and (2) that it contains inadmissible lay opinion in violation of Rule 701. (Def.'s Opposing Statement ¶ 45.) The City objects to related disciplinary documents exclusively on the Rule 403 ground. (Id. ¶¶ 46-68.) Aquila responds to this challenge at some length in its reply memorandum. It argues that the documents constitute admissions and, as such, are admissible notwithstanding prejudice or trustworthiness concerns. (Pl.'s Reply at 2-3, Doc. 70.) I agree with Aquila that its reliance on these admissions does not give rise to

---

[3]     See PSMF ¶ 63; Def.'s Opposing Statement ¶142. Of the 100 gallons, some portion was expelled through the lavatory drain or waste hose rather than into the plane's interior.

unfair prejudice. The Rule 403 objection is overruled. I also conclude that the documents are not rendered inadmissible under Rule 701. In particular, the statements asserted by Aquila are predominantly admitted by the City, including statements 57-62, which relate that the pump switch was left in the on position and that 100 gallons of fluid were pumped into the tank. If there are no disputes about the accuracy of these material factual statements it is because they relate factual findings rather than opinions.

In any event, there is sworn testimony available that establishes the essential material facts. The ramp supervisor on the day in question testified at his deposition that the attendant would have understood that lavatory fluid was continuously being pumped into the plane if he had observed the flow meter as he was trained. Additionally, this supervisor testified that the need to empty the waste hose five or six times should have indicated to the attendant that fluid was still being pumped into the plane. (PSMF ¶¶ 83-84; Beaulier Dep. at 31-33, Doc. 49-4.) The City moves to strike these statements as inadmissible lay opinion. I conclude that this is admissible testimony because it is not based on any scientific, technical or other specialized knowledge that would require an expert designation under Rule 702, is helpful to an understanding of a fact in dispute, and is rationally based on the witnesses perceptions gained from performing lavatory service on aircraft. Fed. R. Evid. 701. I also deem these statements to be admitted because the City's denial (¶ 83) and qualification (¶ 84) are not supported by any record citations. D. Me. Loc. R. 56(c), (f). Another City employee, Mr. Theriault (the shift leader and line service trainer who caught the problem on the night in question and stopped the pump), similarly testified at his deposition that employees are taught to closely monitor the flow meter when pumping and that if the attendant had monitored the meter he would have

caught the problem himself.  (PSMF ¶¶ 91, 94; Theriault Dep. at 8-9, 24, Doc. 49-2.)  He

also testified that the volume of fluid expelled through the waste hose was a clear

indication of "trouble."  (PSMF ¶ 95; Theriault Dep. at 31-32.)

There is conflicting testimony on one issue.  According to Mr. Theriault, the T-

handle on the plane that opened and closed the waste valve also malfunctioned because it

would not lock in the open position but would close when the attendant released the

handle.  (Def.'s Opposing Statement ¶ 143; Theriault Dep. at 52-53, Doc. 64-4.)  The

attendant blamed for the flooding, however, testified that the handle "locked okay."  (Pl.'s

Reply Statement ¶ 143, Doc. 69; Guay Dep. at 31-32.)[4]

Following the lavatory overfill Aquila had the plane flown to Duncan Aviation in

Bloomington, Indiana, for inspection and cleaning.  (DSMF ¶ 24.)  Jerry Tollas, a

certified aviation mechanic and project manager at Duncan Aviation has been designated

by Aquila to testify concerning Duncan Aviation's inspection and cleanup of the plane.

(Id. ¶ 25.)  Mr. Tollas testified as follows concerning the damage:

> [T]he damage to the Aircraft consisted . . . of the carpet, the padding, the
> baggage area material for the sidewalls, and perhaps some foam backing
> under that material.  And then . . . we had to go in and clean up and restore
> the corrosion preventative material after cleaning up the blue fluid. . . .  In
> this case, the damage to the corrosion preventative material is damage that
> can be removed with just cleaning of it and then restoring it."

(Id.; Tollas Dep. at 31-32, Doc. 35-14.)  Duncan Aviation replaced the carpeting,

sidewalls and insulation bags with new materials.  When asked whether there was any

other physical damage to any other component of the plane, Mr. Tollas responded:  "Not

to my knowledge."  (DSMF ¶ 25; Tollas Dep. at 32.)  Mr. Tollas also testified that, as far

---

[4]       If this alleged issue with the T-handle was known to Theriault, who first attended the plane, there
is no indication that he ever communicated a concern to Guay, who took over the lavatory servicing
operation from Theriault.  The City does not articulate how this possible factual issue relieves it of
responsibility and the City has not raised comparative negligence as an affirmative defense.

as he is aware, there has been no corrosion in the plane as a result of the lavatory spill. (DSMF ¶ 26.)  Duncan Aviation sent invoices to Aquila in the amounts of $100,664.45 and $26,944.00 for inspecting, cleaning, and refurbishing the plane after the lavatory spill.  (Id. ¶ 27.)  According to a logbook kept by Duncan Aviation, the plane was airworthy and available for use as of June 21, 2007.  (Id. ¶ 28.)

Aquila submitted a claim and proof of loss to its insurance company to reimburse Aquila for the $127,608.45 it paid to Duncan Aviation to inspect and clean the plane.  (Id. ¶ 43.)  In paragraph 9 of the Proof of Loss form, Aquila "assign[ed] to their Insurer any and all claims and causes of action the insured may have against any other party arising out of the loss for which this Proof of Loss is submitted."  (Id.)  Aquila's insurance company issued a check to Aquila in the amount of $127,608.45 as reimbursement for the costs of inspection and repairs performed by Duncan Aviation.  (Id. ¶ 44.)

On August 30, 2007, Aquila entered into an aircraft purchase agreement with Dartswift, Inc., to sell the plane for $11,200.000.00.  Under paragraph 3.2 of that Agreement, Dartswift was entitled to conduct "a Level 3 pre-purchase inspection of the Aircraft in order to determine that the Aircraft is in the condition required by Section 3.1."  (Id. ¶ 45.)  Aquila sold the Aircraft to Dartswift in December 2007 for $11,200,000.00, after paying a Connecticut outfit called Bombardier roughly $390,000.00 for additional repairs arising from the Level 3 inspection.  (Id. ¶¶ 46-47.)

Between the completion of Duncan Aviation's work in June 2007 and the Level 3 inspection, Aquila leased the plane to Fine Light, LLC.  Fine Light then used the plane for "client visits" and for transportation for Rogers or his staff.  The monthly lease payments were $81,250 plus $4,875.00 in sales tax.  (Id. ¶¶ 48, 50.)

At the time of the lavatory fluid incident, Aquila had a loan in the amount of $9,092,000, the proceeds of which were advanced to Aquila to fund Aquila's acquisition of the plane.  (PSMF ¶ 136.)  As a result of the cancellation of the sale of the plane to Aero, Aquila incurred additional interest payment obligations from May 29, 2007, until December 17, 2007.  (Id. ¶ 137.)  Aquila is seeking to recover well over a million dollars in damages for the post-incident repairs, devaluation of the plane, interest payments, and insurance payments.  (Id. ¶¶ 140-141.)

### Discussion

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  P. R. Elec. Power Auth. v. Action Refund, 515 F.3d 57, 62 (1st Cir. 2008).  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied.  Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 241 (1st Cir. 2006).

There are three summary judgment motions pending: (1) Aquila's motion to obtain judgment on its breach of contract claim, including an attempt to get judgment in a specific dollar amount; (2) the City of Bangor's motion to prune Aquila's damages claim; and (3) the City of Bangor's Hail Mary "cross-motion" to see if it can get judgment in its favor on the question of liability. I begin with the City's motion respecting damages.

## A.      The City's Motion for Summary Judgment (Doc. 33)

The City asks that judgment enter as a matter of law against Aquila's claim to recover $127,608.45 in connection with the Duncan Aviation inspection and repairs because that loss was covered by Aquila's insurer and the insurer now holds the right to recover for that loss through assignment. The City also wants the Court to foreclose any claim for economic damages tied to the lost Aero deal for $12 million. Finally, the City argues that any claim for economic damages must be reduced by revenue Aquila earned by leasing the plane to Fine Light. (Def.'s Mot. Summary J. at 1-2.) Before addressing each of these arguments, some words on contract damages:

Broadly stated, a plaintiff is entitled to damages for contract breach measured by the loss, including incidental or consequential loss. Restatement (Second) of Contracts § 347(b) (1981). Nevertheless, the question of "whether . . . and to what extent special or consequential damages may be recovered in a suit for breach of contract is a question which is often before the courts." Keeling-Easter Co. v. R. B. Dunning & Co., 113 Me. 34, 40, 92 A. 929, 932 (1915). The largest component of Aquila's claim for damages, by far, is its claim associated with the lost sale to Aero. When a plaintiff seeks special damages for breach of contract, such as the loss of profits related to a lost sale, the rule is that such damages may only be recovered where the loss was within the contemplation of

14

both parties when they entered into the contract.  Williams v. Ubaldo, 670 A.2d 913, 917-18 (Me. 1996); Spitz v. Lamport, 119 Me. 566, 568-69, 112 A. 522, 522-23 (1921); Keeling-Easter Co., 113 Me. at 40, 92 A. at 932; Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854); Restatement (Second) of Contract § 351 (1981).  Pursuant to this rule of law, it is not technically correct for Aquila to assert that it is entitled to recover "for the damages it incurred as a result of the collapse of its agreement with Aero."  (Pl.'s Opposition at 5, Doc. 56.)  There is no evidence in this record, after all, that the City was aware of a pending sale between Aquila and Aero, which means that recovery of this component of Aquila's damages claim is not simply a matter of Aquila proving that it once had an opportunity to sell the plane for $12 million and sold the plane for $11.2 million on account of the incident (for a loss of $800,000).  There is no evidence that Bangor agreed to perform lavatory services knowing that a $12 million dollar sale was hanging in the balance.  Consequently, in order to recover damages for a loss of this magnitude as general damages (rather than special damages), Aquila must prove that the spill of lavatory fluid caused a corresponding diminution in the plane's fair market value.[5] VanVoorhees v. Dodge, 679 A.2d 1077, 1081 (Me. 1996); Marchesseault v. Jackson, 611 A.2d 95, 98 (Me. 1992).  Moreover, in the event that Aquila should succeed at that task, it would not be able to stack repair costs and other incidental costs on top of a diminution in value recovery.  VanVoorhees, 679 A.2d at 1081 (holding that the difference between property value pre-breach and post-breach "may be proved *either* by the diminution in market value *or* by the amount reasonably required to remedy the defect") (emphasis

---

[5]     At another point in its opposition brief, Aquila states that it "seeks [to] recover for other foreseeable damages it has suffered, including the benefit of its lost sale to Aero and associated carrying costs."  (Pl.'s Opposition at 4.)  Carrying costs like additional interest payments and insurance premiums may also be inappropriate items of special damages, except, perhaps, to the extent they arise from loss of use during repairs.

added);  Restatement (Second) Contracts § 348 (1981) (reflecting a choice between

alternative measures of damages).  The fact that Aquila computes its damages as either

$1.7 million or $1.4 million suggests that it is looking to tort law rather than contract law

to measure its damages.  (See PSMF ¶¶ 140, 141.)  The summary judgment record would

suggest that Aquila's damages are either in the range of $800,000 for diminution in value,

or else somewhere in the vicinity of $518,000 for the cost of the Duncan Aviation and

Bombardier inspections and repairs,[6] with the possibility of some enhancement for

carrying costs during the repairs.

### 1.   The claim for Duncan Aviation's services

The City observes that, because the expense of Duncan Aviation's services was

reimbursed by Aquila's insurer, and because the associated proof of loss form assigned

the right of recovery for that loss to the insurer, Aquila may not seek to recover that sum

in this action.  (Def.'s Mot. at 3-4.)  Aquila does not want to concede this point entirely.

(Pl.'s Opposition at 3.)  It argues that, because there was only a partial assignment, its

right of recovery against the City is subrogated only to the limited extent of the particular

loss paid by the insurer and does not extend to any other losses.  (Id. at 3-4.)  This is in

conformance with Maine law.  The assignment clause in the proof of loss form is limited

to the loss in question and is not written in a manner that would assign all claims arising

---

[6]       There may be a rather significant causation wrinkle related to Bombardier's services.  It is unclear
from the summary judgment record whether the repairs performed by Bombardier were meant to address
possible harm caused by the presence of lavatory fluid or whether the repairs related to other issues that
turned up on account of a pre-sale inspection.  If the latter is the case, then this is likely a claim for special
damages because Aquila is trying to gain the benefit of its handshake deal with Aero to sell the plane
without any pre-purchase inspection, a special circumstance not within the contemplation of the City when
it performed the lavatory service.  If that special circumstance is set to the side, the record reflects that pre-
purchase inspection is customary in aircraft sales.  It might be necessary for Aquila to prove the difference
in cost between an ordinary inspection and a "level 3" inspection, assuming it can prove that the level 3
inspection was only required because of the incident involving the lavatory fluid.

from an incident or occurrence.  Because there was only a partial assignment, Aquila may

pursue its claim with respect to other losses.  Gannett v. Pettegrow, 224 F.R.D. 293, 294

(D. Me. 2004).  However, Aquila appears to contend that it may pursue the Duncan

Aviation expense as well.  (Pl.'s Opposition at 4 ("Bangor's motion for summary

judgment in regard to Aquila's claim for reimbursement of the Duncan Aviation bill for

$127,608.45 is baseless and must be denied.").)  Aquila fails to support this contention.

The authority it cites indicates that it may only pursue rights that it has not previously

assigned.  The insurer's rights by way of assignment are severable from this action and

may be pursued by the insurer in a separate action (or through joinder, which would be

untimely at this juncture).  St. Paul Fire & Marine Inc. Co. v. Universal Builders Supply,

409 F.3d 73, 81-82 (2d Cir. 2005).  This piece of the City's motion should be granted.[7]

### 2.  The Aero deal

The City argues that the handshake deal reached between Aquila and Aero was

unenforceable for various reasons (Def.'s Mot. at 5-11), or, in the alternative, that Aquila

should not have permitted Aero to walk away from the deal because the lavatory fluid

spill did not give Aero a right to avoid the contract (Id. at 11-13).  In effect, the primary

focus of the City's motion is its effort to establish that the Aero deal never culminated in

an *enforceable* contract.  In opposition, Aquila attempts to prove up the Aero contract as

if proof on an enforceable contract would yield the prize of an $800,000 damages award.

(Pl.'s Opposition at 5-11.)  I conclude that the parties are on the wrong track.  I have

already explained why an award of special damages based on the Aero handshake deal

---

[7]     It is beyond the scope of this summary judgment proceeding to determine what impact this portion
of the summary judgment disposition would have on any future damages award, either in terms of
instructing the jury on damages or in terms of reducing any award stated in its verdict.

would not be appropriate in this case.  Aquila is not entitled to the profit it lost from the Aero deal unless the City had knowledge that its breach of a lavatory service contract would result in such an injury to Aquila.  Consequently, in order to recover damages on the order of $800,000, Aquila must prove that such a figure reflects the diminution in value of the plane as a consequence of the incident.  Viewed in the light most favorable to Aquila, diminution of the plane's value on account of the spill is a reasonably foreseeable consequence of a breach.  Loss of the Aero contract, however, is a special circumstance unique to Aquila and not fairly within the contemplation of the City.  As a matter of law it is not reasonable to regard this loss as a foreseeable consequence of a breach of the lavatory service contract unless the City was privy to the Aero deal.  Williams, 670 A.2d at 918.  See also Forbes v. Wells Beach Casino, Inc., 409 A.2d 646, 654-55 (Me. 1979) (overturning damages award related to highest and best use of land where party in breach had no knowledge of other party's plans).  Because there is no apparent basis for special damages in this case, it is not productive to discuss in detail the parties' dispute over the enforceability of the Aero deal for purposes of summary judgment.  The question for trial is whether Aquila will be able to prove damages based on diminution in value in order to justify damages in excess of the costs of repairs.[8]

### 3.  Setoff

The final piece of the City's motion addresses the following concern:  "If this Court were to determine that all or part of [Aquila's loan and insurance] carrying costs are available to Aquila as damages for its breach of contract claim, those damages must be

---

[8]      The City's summary judgment challenge does not crystallize the diminution in value issue.  The Motion to Exclude Mr. Justice's testimony impacts that item of damage, of course, but the Motion to Exclude was not woven into the City's Motion for Summary Judgment.  Indeed, there is no mention of it in Defendant's Motion for Summary Judgment.  I have not independently assessed whether the lay witness testimony in the record is sufficient to support a non-speculative jury finding related to diminution in value.

offset by the income to Aquila generated by the Aircraft during that time period." (Def.'s Mot. at 13.) Note the use of the word "if." In response, Aquila states that it "has already reduced its damages claim [in its own motion for summary judgment] to reflect the real economic benefit associated with being able to lease the Aircraft during the relevant time period." (Pl.'s Opposition at 15-16.) Aquila concedes the City's qualified legal point, but disputes the City's calculation of the set off. (Id. at 16-17.) Aquila's concession of the legal point effectively resolves the summary judgment challenge. Still, this leaves a material legal question hanging in the air. Is Aquila entitled to its carrying costs? The issue, ultimately, is foreseeability. While it might be reasonably foreseeable to find that carrying costs would accrue during a period in which the plane was out of service for repairs,[9] there is no reasonable basis in this record for a finding that the City would have foreseen liability for a protracted period of carrying costs extending until the date on which Aquila could close on a sale of the plane.[10] The parties are advised to sort these details out in advance of trial.

**B.     Aquila's Motion for Summary Judgment (Doc. 28)[11]**

Aquila's Motion for Summary Judgment asks the Court not only to find that liability exists as a matter of law, but also to find the amount of damages in a specific amount. (Pl.'s Mot. at 1, 7.) In order to obtain judgment on its claim for breach of contract, Aquila must prove (1) breach of a material contract term; (2) causation; and (3) damages.

---

[9]      On the other hand, it might be questioned why Aquila's interest payments would be within the reasonable contemplation of the City. As a party providing lavatory services it was not in the same position as, say, a building contractor who might well be aware of the other contracting party's carrying costs.

[10]      The point here is that the City was a party performing a service contract. Had the City breached a contract to purchase the plane, then it might well be foreseeable that Aquila would have carrying costs extending until the date it sold the plane to another party. See, e.g., Pelonis USA, Ltd v. Del-Rain Corp., No. 94-CV-587S(F), 2000 U.S. Dist. Lexis 15279, *69 (W.D.N.Y. Sept. 5, 2000) (applying UCC provisions respecting damages).

[11]      A redacted version is available at docket entry 27.

Insofar as these three elements are intertwined with one another, and insofar as I have already explained why the amount of damages can only be regarded as disputed on this record, I see no good reason why the Court should grant summary judgment on Aquila's contract claim. It may well be true that a finding of breach is compelled by this record. Nevertheless, because essentially all of the evidence presented in these motions will need to be presented to the Jury in order to support factual findings related to damages, my recommendation is that the Court should deny Aquila's Motion and put the entire contract claim to the Jury. After all, even if it would be fair to find, as a matter of law, that breach is established, breach alone is not proof of the entire contract claim. In the absence of undisputed facts establishing the exact amount of damages caused by the breach, the Plaintiff, Aquila, is not entitled to "judgment" at this time. Fed. R. Civ. P. 56(c).[12]

## C.     The City's "Cross-Motion" for Summary Judgment (Doc. 68)

In its summary judgment opposition memorandum (Doc. 62) the City makes its first reference to a "cross-motion" for summary judgment. The Clerk entered a new "cross-motion" on the docket at entry 68. In its original motion for summary judgment, the City seeks only to preclude an award of certain damages. In its opposition/cross-motion, however, the City argues that it is entitled to summary judgment on the liability question, even though it did not timely seek summary judgment on the liability question in its original motion. I recommend that the Court terminate the cross-motion and enter no order on it. The cross-motion is untimely under the scheduling order and it does not

---

[12]     The Advisory Committee Notes related to the 2007 amendments to Rule 56(c), (d), and (e) state that the right of the movant to summary judgment is no longer framed in mandatory terms. The term "should" has replaced the term "shall" in Rule 56(c). The Committee explains: "It is established that although there is no discretion to enter summary judgment when there is a genuine issue as to any material fact, there is discretion to deny summary judgment when it appears that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56 advisory committee's note (2007).

comply with Local Rule 56.  Besides, denial of Aquila's Motion should in no way be interpreted to suggest that the facts of this case cannot establish a breach of contract, even in the absence of the admissions on which Aquila has based its motion.

## CONCLUSION

This is a case about damages and it would appear that the parties have not yet thoroughly analyzed the facts of this case in relation to the law of contract damages, either in terms of the alternative methods of proof or in terms of the limitations placed on special damages.  Based on the foregoing discussion, I RECOMMEND that the Court DENY the Plaintiff's Motion for Summary Judgment (Doc. 28) and GRANT, in part, the Defendant's Motion for Summary Judgment (Doc. 33).  I further RECOMMEND that the Court STRIKE the Defendant's so-called cross-motion (Doc. 68).  The Defendant's Motion to Exclude Joseph L. Auster's testimony (Doc. 26) is DENIED.  The Defendant's Motion to Exclude Barry P. Justice's testimony (Doc. 31) is GRANTED IN PART.

## CERTIFICATE

Any objections to the orders regarding the motions to exclude shall be filed in accordance with Fed.R.Civ.P. 72.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 31, 2009